Thank you, your honor. Can you hear me? Okay. Yes. Thank you, your honors, and may it please the court. I'm Jonathan Sternberg and I represent the plaintiffs, the appellant plaintiffs, in these two consolidated cases, Thomas Harder in one and Jennifer West in the other, who is the personal representative of the estate of her late husband, Ronald West. The plaintiffs appeal from respective summary judgments in favor of the Union Pacific Railroad on their injury claims under the FELA. The district court excluded their causation expert that they had in common, Dr. Ernest Chiodo, holding that his testimony that their exposure to carcinogenic toxins during their railroad work was a likely cause of lymphoma in Mr. Harder's case and renal cancer in Mr. West's case, and that this was inadmissible under the Daubert standard. And because the plaintiffs then had no medical causation expert, the court granted the railroad summary judgment. In both cases, excluding Dr. Chiodo and therefore granting summary judgment was error. This court should reverse the district court's judgments in both cases and remand both cases for trial. The district court fundamentally misapplied the liberal admission standards for expert testimony under Rules of Evidence 72. Let me interrupt you and direct you to the West case. Yes, your honor. Just focusing on it alone, and I understand that there's much in common, including your briefs and everything else, the records, it's not a denigration, but focus just on the West case. Goodness gracious, you have the one little bit of testimony about how bad he smelled, and then your expert appeals to the authority of his education. In the West case, how do you have enough under any standard to go anywhere in the West case? Well, in the West case, it's not just how bad he smelled, your honor. I think that's minimizing it a little bit. Counsel, that's a testimony. That's the way she ends her testimony. That's how filthy he was and how bad he smelled. I'm quoting from 138 of your appendix. Oh, I understand that, but she says a lot more than just that. He came home soot-filled, black, filthy, smelling awful, to the point she would make him get naked in my garage before he would come into my home. After every shift he worked, his hands were black, his face was black, his clothes were black, his jeans that were blue at one time had black creosote soot stains. This goes on and on. It's not just paid for. No, it doesn't go on. Now, wait, be careful with me. I know she says it's every shift, but basically it doesn't connect it at all to diesel, fuel, exhaust, benzene, any of these bad things. I'd point your honor to pages 147 and 149 to 50 as well of our appendix, which is also in her testimony. She talks about how he described her, how the air quality sucks, how for 12 hours the exhaust fumes were horrible, the diesel fumes would come right back in their face, there's no ventilation on the cab, his safety goggles and his gloves would be just covered in black and they'd reek. Your honor, I would submit that she did connect that to the inhalation of diesel exhaust, especially given the amount of time he worked for the railroad, which obviously is undisputed and in the record as well. That alone is enough for Dr. Teato. You and I have about covered it. Then all Dr. Teato does is appeal to his education. He doesn't connect the dots. He doesn't really... That's also not the case, your honor. Pages 301 to 303 of the appendix, which is in his report, he looks at scientific studies about workers in rail yards having significant exposure to diesel fumes, diesel fuels, et cetera, and that there's an increased risk of renal parurin, I apologize, I'm not a doctor. Did he testify that he didn't use that to form his opinion, that that was just to confirm his opinion? Well, as this court held in a couple of cases that we point to, I'd point the court to the Benham case, which is in this court in 2005. An expert can use his ordinary reasonable knowledge. This guy, Dr. Teato is an industrial hygienist. He's a physician. He's an attorney. He can understand it. It's likely that if you inhale a lot of gasoline fumes, it could cause cancer, and so he used that to confirm his opinion. There's nothing wrong with that. In this court, we cite a whole bunch of cases in both of our briefs that an expert is allowed to do that. He can rely on his training and experience and then confirm that with studies. Sorry, I thought you had a question for me. No, no, I just wouldn't want to jump in too quickly on Judge Erickson. But in this West case, if you look at 766, and I appreciate your reference to the record, Mr. Sternberg, in this case at 765-66, he says he's solely appealing to the authority of his education and he says he can't rule out all other kinds of causes, and so do we end up with what's called in the trade an Ipsy-Dixit case, and that's the Supreme Court standard, as you well know. Why doesn't the West case end up being an Ipsy-Dixit case? Because it's not, Your Honor. He is allowed to appeal. Dr. Chiodo is allowed to appeal initially to his own knowledge and his own experience dealing with cancer and industrial hygiene. It's not an Ipsy-Dixit because that's what he's relying on. In the Benham case, the court said that Daubert allows a witness to qualify based on his own knowledge, skill, experience, and testimony based on his own practice and a review of the evidence is proper. And then he uses that to use the scientific studies to confirm what he already suspected. That's entirely proper. And as to the failure to rule out some causes, this court held many times, including in the Johnson v. Mead-Johnson case, which Judge Benton, I know you were on the panel on that back in 2014. In Johnson, the court specifically holds that you don't have to rule out all other possible causes. I'll point to the Prempro case from this court in 2009, I believe. Prempro is 2009, where it was also a failure in a cancer issue to rule out all other possible causes, including smoking as one, as long as the... In Prempro, though, there was very specific references to the level of exposure to a known cause of the injury, says the court. What do you think about that? I appreciate that. These are two sides of this coin. One side is ruling in, one side is ruling out. I was just talking about ruling out in Prempro. Ruling in is a little different. That goes to the railroad's primary argument in response to both cases is this dose response issue. They call it dose response. Your Honors, I call that a time machine rule. They're trying to say that unless a plaintiff took precise measurements at the time, let alone when you have an injury that manifested itself decades, as in Mr. Harder's case, decades afterward, or in both cases, that unless you can show the precise level of exposure, you can't possibly prove your claim. This court has never held that. Okay. I suppose you're right on that. Don't you at least have to describe the work side and describe the exposures? Don't you think you have to do that? These other cases mostly do that, especially several of the cases that you're very familiar with. Certainly. Mr. Harder's case undoubtedly does that. Mr. Harder explained in great detail back in Wisconsin in the wintertime, working in a shed with two running locomotives spewing diesel exhaust all day and explained it in great detail, which is why I think your Honor didn't ask me about that at the outset. That's why I'm calling on the West case. You got it. The other side gets to answer about Harder, but you get to answer about West. Go ahead. Fair enough. But in West, it was enough. Mr. West is dead. It's hard to have the level of testimony you would in Mr. Harder's case. But your Honor, what his... Well, wait. Before you run away from that too quickly, at this stage, your Honor noticed what's going on. He had co-workers. This building probably still exists. Go ahead. In addition to that, isn't Dr. Perez's data out there, which was used in the other Nebraska cases? Yes, it certainly is, and I think that that's appropriate. But Dr. Choder, I think, testified in West that he didn't rely on Dr. Perez's data, which is... I know, but why not? That's a problem. But again, going back to what the wife testified, pages 147 to 150 of her deposition about how for 12 hours each shift, the exhaust fumes were horrible. He was in this cab, in a railroad cab with no ventilation, and day in, day out, and his safety goggles and his gloves would be covered in black and they'd reek. That's enough. The cases that I think Judge Benton was referring to that I'm familiar with, Bonner and Mattis, are ones where you had an employee testifying very briefly in the Bonner case as to the single exposure that she had at her workstation. It's not a whole lot different than what Ms. West related about what her husband testified. That's enough, at least, for Dr. Choder to rule in this as a cause. Counsel, so I guess I still have a question on medical causation. I'm not seeing with the methodology that Dr. Choder used, how does it distinguish between a possible cause and a likely cause? Well, this goes to the FELA standard. So the FELA standard from the Supreme Court case, the McBride case in 2011, that the railroad's action likely played a part, no matter how small, in bringing about the plaintiff's injury. So it's not about probable cause. I mean, FELA is a lower standard. And we aren't arguing. I'm interrupting you because your time is short, and you know how to answer questions. So that goes to relevance. I got that as a theme of your brief. It's a good theme. But that goes to relevance. It's highly relevant because you don't need much. Get it? But it doesn't go, I think this case is mostly about reliability. You know, the third of the three in 702. Tell me why I'm not wrong about that, because I know that's the theme of your brief, that the causation standard and the proof standard is so low. Go ahead. Talk about it. Because it goes to both. The Dalbert factors, you're right, are all about reliability. It's not the relevance factor, which is the first factor under 702. But what Judge Grass was just asking me was how this goes to, how Dr. Choder's testimony would prove that it's a probable cause as opposed to a likely cause. My response to that was under the FELA, all he has to show is that it's a likely cause. But it goes to reliability because the question is, what is his testimony reliable enough to show? What is his testimony reliable enough to give? Now when you phrase it reliable enough to show, that sounds to me like relevance. Tell me why I'm wrong. You feel free. Tell me why I'm wrong. Relevance, your honor, is whether this evidence is necessary to prove the plaintiff's claim to begin with. For example, these are medical injury cases. So you always have to have some, the issue of causation is always relevant. The issue of whether the allegation that the railroad caused the injury is relevant. But once you get to reliability, the third factor, then you get into what is this methodology. In the Gibson case in 2004, which the court quoted in Johnson as well, Dalbert's whether the methodology itself is reliable, not challenges to how that methodology is applied. All of the railroad's challenges and all of the district court's criticisms of Dr. Chiodo's application of this methodology is all about how it's applied. So as long as an expert uses reliable methodology, which this is a differential etiology analysis. In Johnson, in footnote two, this court said specifically that that's presumptively reliable methodology. Counsel, isn't Dr. Chiodo really just saying that exposure to carcinogens can cause cancer, and isn't that just a truism? Well, he certainly said that it can cause cancer, but he said that the kind of exposure that Mr. Harder reported to him in person and that he read from Ms. West's own deposition, that was sufficient enough to cause cancer in these cases. And I see that I'm eating into my... You may reserve. Thank you, your honor. Mr. Graham. Thank you, Judge Benton. Good morning, your honors. Jason Grahams for Union Pacific. May it please the court. These consolidated appeals are resolved by three propositions. First, the FELA's burden of proof standard, including its modified causation standard and federal rule of evidence 702 are separate inquiries and do not affect each other. Second, this court's decision in right against Willamette requires at a minimum for experts to base their opinions on dose and response, and experts may not evade this court's requirement by testifying that there's no safe amount of exposure. Third, the district court did not abuse its discretion in finding that Dr. Chiodo unreliably failed to base his opinions on facts or data, refused to even attempt to quantify dose and response, and refused to even attempt to rule out or explain alternative causes as the sole cause of the injuries alleged. Today's dispute flows in part from an intra-district disagreement regarding the standards for admissibility of experts between District of Nebraska Judges Girard and Swart on one side and Judge Battalion on the other side. Judges Girard in the McLaughlin and Bettysworth case and Judges Ward in these two cases and the O'Neill case consistently hold that the FELA's causation standard and federal rule of evidence 702 are distinct issues and don't affect each other. Well, counsel, they're in the same case and I think you have to take these cases each on their own facts. That's what we do here rather than set wise policy. And one of your main points was about exposure. Harder testified exposed daily to fumes, fuel, other smoke. It was like a London fog. He testifies. So doesn't that, unlike the West case, doesn't that get you almost all the way there? And then Chiodo does good enough. I know he can't rule out age and idiopathic and I know he does an apportion, but boy, once you get back to the truism Judge Gross talked about, isn't that enough? No, it's not, Judge, and here's why. This court is reviewing not what counsel was able to put into the appellate record, but what was before Dr. Chiodo at the time he formed his opinions. And that deposition from Mr. Harder was taken after he had submitted his report. So all that information, and none of it is quantifiable either, and he didn't do any testing. Exposure daily is quantifiable. Daily exposure to all kinds of fumes. I don't, I, you think we have to have it down to the numbers of the dose? I think, I think there's got to be an effort to provide an estimate of what the dose could have been. And you've got to have evidence. And here, Dr. Chiodo didn't have that deposition. All those facts, the London fog and so forth that are so prominent in the briefing on appeal were not before Dr. Chiodo when he reached his opinion. They just weren't. He didn't base his opinion on those facts. Now wait, we're reviewing the district court, so tell me why we don't look at it at the end of the day, the whole record. We look at what Dr. Chiodo based his opinion on to determine whether it's reliable. The district court found that as well, that it wasn't reliable because he didn't base his opinion on any facts or data. And in his deposition, Dr. Chiodo testifies, and this is on page 171 of the appendix. He, you know, what did you rely on? Relied on Mr. Harder's job title as a machinist. Relied on Mr. Harder did extensive repairs of locomotives. And then there, that he was heavily exposed to diesel exhaust. Well, did you, did Mr. Harder tell you he was heavily exposed, or is that your characterization? Yeah, I don't know. It could be either. That's it. That's all he testified at his deposition that he relied on. And now on appeal, counsel attempts to challenge these findings by smuggling in evidence that wasn't considered by Dr. Chiodo when he formed his opinions throughout the briefing. It's just paramount to consider that this deposition of Mr. Harder occurred after Dr. Chiodo submitted his report. It couldn't have been relied upon. And Dr. Chiodo claims he had a telephone conversation with Mr. Harder before he issued his exposure opinion. But in his deposition, he testifies he can't remember what Mr. Harder told him. So what's happening here, when it's their burden, is counsel's appearing before you and saying, we should assume that everything that happened at this later deposition was told to Dr. Chiodo by Mr. Harder in this short phone call, even though we don't have any evidence of it. Okay, so what's the closest case that has facts like these, where the expert talked and can't remember? You know, you know what I'm trying to say, Mr. Grahams. Give me a close case that tells me that you're right, that you don't look at that, that the district court doesn't look at it, looking at the deposition, the testimony, the causation, and all of it at the end, as opposed to at the time the expert testified. I don't have a case in front of me. I know we cited one in our brief, probably more than one. But I would say that... Okay, you'll need to call that to my attention, because it didn't register. It may be my fault. I'm not after you. But please do that, because that to me seems, on Harder's case, a critical factor. I will do that, Judge Bylatter. Once this court clarifies that the FELA causation standard does not affect Rule 702, this court's... Well, counsel, it's got to affect... I didn't go alert on that last time, but it's got to affect relevancy, duh. Right? The FELA standard has to affect whether something's whether it's a cause or the cause, right? And that's what counsel argues in his brief. But the problem with that is the district court applied that standard in this case. There's a burden of proof standard, and the FELA provides the burden of proof standard. And this is the Clark case and many other cases we cite in our brief. I think Clark puts it best. The FELA... Not the FELA. The burden of proof standard and the evidentiary standard are two excellent ones. We dispose of criminal cases all the time with a higher burden of proof standard, proof beyond a reasonable doubt, and civil cases with a proof by preponderance of the evidence standard. And we apply the same rules of evidence to those. There's no alteration to the rules of evidence based on what the substantive standard is for burden of proof. And we wouldn't alter things like the hearsay rule because this is a FELA case. We decide whether the evidence comes in based on the evidentiary rules. And here the policy of those rules is significant. We're trying to determine that decisions are based on evidence that's reliable and that's relevant. And that's what Dr. Chiodo just didn't do in this case, Judge. He can't shirk his duty to provide dose and response at a minimum by applying this no safe amount of a substance present in the air that all of us breathe. And I was just reading last night, I'd like to commend the NBC versus Associated Milk Producers case for a discussion of that no safe amount. It is a lengthy discussion of the history of it and I thought it was very useful. In the reply briefs, counsel in both of them props up a straw man stating at least six times per brief that Union Pacific argues that there's an exact or a precise requirement for dose and response. But not only does the citation he provides not bear that out, I went through our briefs and text searched for exact and precise and those words don't occur even one time in our briefs. But the expert... Didn't you argue that here today, though, Mr. Grims? Didn't you just argue that earlier, that you need a precise amount? Absolutely not. No, there's no question that the expert doesn't need to provide a precise amount, but he's got to at least estimate what the threshold is and estimate what the response is. Dr. Chioda just didn't... I'm sorry. Is that really true? Doesn't he just have to say that the amount of toxins to which the plaintiff was exposed was sufficient to cause cancer in a human being subjected to the same level of exposure? So all the dosage requirements that requires is just that he was exposed to these toxins and the toxins were sufficient in quantity based on whatever evidence he's got in the record to cause cancer in a person who is subjected to that level of exposure. Isn't that all that's required? He has to reliably opine about both parts of that medical causation question. So there's got to be evidence of general causation and there's got to be evidence of specific causation. And the general causation amount is how much of this substance can cause this disease in human beings in general. And the specific causation is how much of this substance was this plaintiff exposed to? And was it greater than the threshold amount? Kenzo, I thought that under the Kirk case, the expert didn't necessarily have to quantify an exposure amount. I agree that the expert does not have to necessarily quantify the exposure amount, but he has to make some effort to quantify and provide evidence at a minimum, according to Wright against Willamette, to show that there was an exceeding of the threshold amount. And here he just didn't do that. He didn't do the work. There's no effort to establish the threshold amount. In fact, he refused to even try to do it. There's no effort to establish in either one of them. There are post hoc efforts to bring in evidence that wasn't before Dr. Chiodo at the time he made his opinions in these cases. And when we deposed him, he told us what he relied on. And in the West case, he relied only on that one statement that Judge Benton was talking about a little bit ago. Well, what about the second one? The counsel here at Oral Argument pointed out the later ones on 147, 148 about bad conditions and all this stuff there, like a charcoal grill. So what about, I agree with you, I thought it was just the earlier stuff, but what about the stuff on 147, 148? So in the appendix, page 300, we asked him what, I'm sorry, this 282, we asked him what facts he relied upon to determine Mr. West's diesel exhaust exposure. One, Mr. West was a conductor slash locomotive engineer, and in his unsupported opinion, locomotive engineers generally have high levels of exposure. Two, Mr. West's wife said he'd come home from work soot-filled with black hands and that he smelled bad. And three, co-worker Ron Henderson's deposition, but he didn't remember what Mr. Henderson said. Okay. There's no quantifiable information there at all. And Dr. Chiodo didn't attempt to quantify it. He doesn't, and this is in both cases, does not know anything about Dr. Perez's exposure opinions. And he specifically states that he did not rely upon them in this appeal. And I'll cite that. That's 260, he admits it in the West case, and we attach this to the addendum in the Harder case on page two. Does not review and rely on Mr. Dr. Perez's industrial hygiene reports. He didn't do any studies, didn't take any samples, didn't review any sites, he didn't review available air sampling data that plaintiff's counsel has from Union Pacific. He didn't review material safety data sheets. He didn't calculate or quantify anything at all. And I would just remind the court, I'm sure you saw it in the briefs, that Dr. Chiodo clearly describes his methodology in these cases. And his methodology is, the methodology circulates through the neurons in my brain and results in his opinions. These are charitably not the methods and procedures commonly associated and used by experts in any of the It is, as you mentioned earlier, Judge Benton, I'm sure Ipsy Dixit and GE against Joyner makes it clear the district court was not required to accept any of them. As Judge Schwartz said in her order, Dr. Chiodo's not aware of any specific details of exposures. He's unaware of the length of exposure, concentration, and atmosphere of exposure. He relied on no facts or data to determine the level or length of exposure. His opinion is speculation based on plaintiff's job title and supported with no further facts or data. No attempt was made to review air sampling data that's available or industrial hygiene data that's available. No attempt to quantify anything. Instead, the court found Dr. Chiodo, and I think this is true, that he testified he can form a medical causation opinion without any knowledge of the type, extent, or duration of exposure because any exposure can cause cancer. Did the district court address the exposed daily testimony of Harder himself? I don't believe so, but the district court did understand that Mr. Harder's deposition occurred after his report was in and was not the part of the basis of his opinions. It is simply not too much to say Dr. Chiodo never had any evidence of how much exposure either plaintiff had to any of these alleged substances. The district court did not err and certainly did not abuse its discretion in finding Dr. Chiodo's opinions were nothing more than speculation based upon Weston Harder's employment at the railroad. I see my red light is on. May I close? I thought you just did, but I'll give you one sentence. We ask the court to affirm the district court's decision in these cases. Thank you, Mr. Grahams. Mr. Sternberg. All right, I'll start at the back and work my way forward. Judge Benton, you just asked if the district court had addressed whether this exposed daily thing from Mr. Harder and most Mr. West's cases. In both cases, the district court held that, citing no authority, I'll note that Dr. Chiodo couldn't rely on their testimony at all, that he had to rely on some other kind of study, and that's simply not true. We point that out in countless cases in our briefs. As for this notion that the deposition of Mr. Harder took place after the deposition of Dr. Chiodo, on page 410, which is in Dr. Chiodo's report, he mentions that he had a telephone conversation with Harder in the Bonner case from this court in 2001. The court held that the worker could prove through her own testimony that her exposure was of the sufficient duration for... Did he also say, I don't want to burn your time, but I do want to ask you, did he also say that he didn't recall what the conversation was about? No, I don't recall that being in the record. Okay, proceed. Your Honor, we'll see that. As far as the standard of having to quantify this in any way, the Mattis case from 2002, which I know they don't mention at all, takes care of that. There, the expert couldn't determine the exact exposure level, but simply said experts known for a long time that the organic solvents at issue in that case were capable of causing the injuries at issue, and this court held that a plaintiff only needs to make a threshold showing that he or she was exposed to toxic levels. And there, again, it was the electrician, the worker's own testimony as to what the circumstances of their exposure were. As far as the standard and how... I agree that FEWA does not change the standard at all, but it does go to reliability. It says, long as the plaintiff's causation expert can present scientifically reliable evidence that the toxic exposure could have played some role, however small, in causing the injury, the testimony should be admitted. And under Daubert, the expert isn't required to rule out all possible causes. So here you have a differential ideology analysis. Everything you just heard from my opposing counsel is an attack on the application of that analysis and not the analysis itself. He was ruling in causes. He was ruling out causes. They say he didn't have enough information to rule in the causes and that he shouldn't have... or he can't conclude about causation without ruling out some other causes. But that's all classic application. That goes to wait. It doesn't go to admissibility. Counsel, your time's expired, but I'll give you a sentence since I gave Mr. Graham's a sentence. This court should reverse the trial court's judgments in both cases and remand this case for trial. Thank you, Mr. Sternberg. Thank you, both counsel. Cases number 20-1422 and 20-1417 are both submitted for decision by the court.